# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

CHARLES G. BRANT,

      Plaintiff,

v.

                                        Case No. 3:13-cv-412-J-34MCR

BARRY REDDISH, in his official
capacity as the Warden of Florida State
Prison, and MARK S. INCH,[1] in his
official capacity as the Secretary, Florida
Department of Corrections,

      Defendants.

_____

FRED ANDERSON, JR.,

      Plaintiff,

v.

                                          Case No. 3:14-cv-1148-J-34JBT

BARRY REDDISH, in his official
capacity as the Warden of Florida State
Prison, and MARK S. INCH, in his
official capacity as the Secretary, Florida
Department of Corrections,

      Defendants.

_____

---

[1] In all three actions discussed in this Order, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, the Court substituted Mark S. Inch for Julie Jones as the proper party Defendant as the Secretary of the FDOC. See Brant v. Reddish, No. 3:13-cv-412-J-34MCR (Doc. 111 at 1 n.1); Anderson v. Reddish, No. 3:14-cv-1148-J-34JBT (Doc. 69 at 1 n.1); Jackson v. Reddish, No. 3:14-cv-1149-J-34JBT (Doc. 75 at 1 n.1).

ETHERIA V. JACKSON,

     Plaintiff,

v.                                    Case No. 3:14-cv-1149-J-34JBT

BARRY REDDISH, in his official
capacity as the Warden of Florida State
Prison, and MARK S. INCH in his official
capacity as the Secretary, Florida
Department of Corrections,

     Defendants.

_____

## ORDER

## I.   Status

      Plaintiffs, Charles G. Brant; Fred Anderson, Jr.; and Etheria Jackson, are death row inmates of the Florida penal system who have initiated, through counsel, nearly identical actions challenging the constitutionality of Florida's lethal injection protocol pursuant to 42 U.S.C. § 1983. See Brant v. Reddish, No. 3:13-cv-412-J-34MCR (Brant); Anderson v. Reddish, No. 3:14-cv-1148-J-34JBT (Anderson II); Jackson v. Reddish, No. 3:14-cv-1149-J-34JBT (Jackson II). Brant is proceeding on a First Amended Complaint, see Brant (Doc. 102; Brant FAC), Anderson is proceeding on a Second Amended Complaint, see Anderson II (Doc. 57; Anderson SAC), and Jackson is proceeding on a Second Amended Complaint, see Jackson II (Doc. 62; Jackson SAC). (Amended

Complaints).[2] As Defendants, Plaintiffs sue Barry Reddish in his official capacity as the Warden of Florida State Prison, a position in which "he is responsible for all executions and for the administration of lethal injection for the Florida Department of Corrections" (FDOC), and Mark S. Inch in his official capacity as the Secretary of the FDOC "where [he] is responsible for the creation and enforcement of policies and procedures" applicable to executions by lethal injection. Amended Complaints ¶¶ 15-16. As relief, Plaintiffs seek: (1) temporary, preliminary, and permanent injunctive relief prohibiting Defendants from executing them using the current lethal injection protocol; (2) an order declaring the existing lethal injection protocol unconstitutional; and (3) an evidentiary hearing or such other relief as this Court may deem just and warranted. Id. ¶¶ 7, (a)-(c).

Defendants filed a motion to dismiss in each of the three cases. See Brant (Doc. 104; Brant Motion); Anderson II (Doc. 60; Anderson Motion); Jackson II (Doc. 65; Jackson Motion). (Motions).[3] Plaintiffs filed responses in opposition to the Motions. See Brant (Doc. 107; Brant Response); Anderson II (Doc. 65; Anderson Response); Jackson II (Doc.

---

[2] Brant, Anderson, and Jackson's operative complaints, including the attached exhibits, are nearly identical. See Brant FAC; Jackson SAC; Anderson SAC. As such, the Court refers to Brant, Jackson, and Anderson's operative complaints collectively as Amended Complaints and the exhibits collectively as Amended Complaints Ex. Citations to the Amended Complaints refer to the allegations that are present in each of the three complaints at the same paragraph number. Citations to the Amended Complaints Ex. refer to the allegations that are present in the relevant exhibit at the same paragraph number. Where necessary to distinguish between the three complaints, the Court will cite to the Brant FAC, the Jackson SAC, and the Anderson SAC specifically.

[3] The motions to dismiss are almost identical except that the Brant Motion does not contain a statute of limitations argument. See Brant Motion; Jackson Motion; Anderson Motion. Thus, the Court refers to the three Motions collectively as Motions. Citations to the Motions refer to the allegations that are present in each Motion at the same paragraph number or page. Where necessary to distinguish a particular Motion, the Court cites to the Brant Motion, the Jackson Motion, or the Anderson Motion specifically.

71; Jackson Response). (Responses).[4] On April 2, 2019, and June 13, 2019, Defendants filed notices of supplemental authority in support of their Motions, in which they advised the Court of the United States Supreme Court's decision in Bucklew v. Precythe, 139 S. Ct. 1112 (2019), see Brant (Doc. 108); Anderson II (Doc. 66); Jackson II (Doc. 72), and the Florida Supreme Court's decision in Long v. State, 271 So. 3d 938 (Fla. 2019), see Brant (Doc. 110); Anderson II (Doc. 68); Jackson II (Doc. 74). Defendants' Motions are ripe for review.

## II. Background

### A. Jackson

A jury convicted Jackson of the November 1985 first degree murder of Linton Moody. Jackson v. State, 530 So. 2d 269 (1988). By a vote of seven-to-five, the jury recommended that Jackson be sentenced to death, and the trial court followed that recommendation sentencing Jackson to death. Id. at 271. The Florida Supreme Court affirmed Jackson's conviction and sentence on May 5, 1988, see id., and his death sentence became final on January 23, 1989, when the United States Supreme Court denied certiorari review. Jackson v. Florida, 488 U.S. 1050 (1989). Thereafter, on September 9, 1993, the Florida Supreme Court affirmed the denial of Jackson's initial request for state postconviction relief, Jackson v. Dugger, 633 So. 2d 1051 (Fla. 1993),

---

[4] Like the Motions, Plaintiffs' Responses are essentially identical with the only significant difference being that the Anderson Response and the Jackson Response include argument in opposition to Defendants' statute of limitations defense. See Brant Response; Jackson Response; Anderson Response. Therefore, the Court collectively refers to Plaintiffs' Responses as Responses. Citations to the Responses refer to the allegations that are present in each response at the same page number. Where necessary to distinguish between the Responses, the Court cites to the Brant Response, the Jackson Response, and the Anderson Response specifically.

and on December 15, 2003, this Court denied Jackson's initial federal petition for writ of habeas corpus, <u>Jackson v. Crosby, Jr.</u>, No. 3:94-cv-492-J-20 (M.D. Fla. Dec. 15, 2003) (Doc. 55).[5]

### B. Anderson

A jury convicted Anderson of the 1999 first degree murder of Heather Young.[6] <u>Anderson v. State</u>, 863 So. 2d 169, 174 (Fla. 2003). The jury unanimously recommended that Anderson be sentenced to death, and the trial court followed that recommendation sentencing Anderson to death. <u>Id.</u> at 175. The Florida Supreme Court affirmed Anderson's convictions and sentence on September 25, 2003, <u>see id.</u> at 174, and his death sentence became final on March 22, 2004, when the United States Supreme Court denied certiorari review. <u>Anderson v. Florida</u>, 541 U.S. 940 (2004). On July 9, 2009, the Florida Supreme Court affirmed the denial of Anderson's initial request for state postconviction relief. <u>Anderson v. State</u>, 18 So. 3d 501 (Fla. 2009). Thereafter, this Court denied Anderson's initial federal habeas petition, <u>see Anderson v. Sec'y Dep't of Corr.</u>, No. 5:09-cv-450-Oc-10KRS, 2011 WL 2784192, at *1 (M.D. Fla. July 15, 2011), and the Eleventh Circuit Court of Appeals affirmed the denial, <u>see Anderson v. Sec'y, Dep't of Corr.</u>, 752 F.3d 881, 883 (11th Cir. 2014).

---

[5] Jackson also filed a successive state postconviction motion pursuant to <u>Ring v. Arizona</u>, 536 U.S. 584 (2002), <u>see Jackson v. State</u>, 952 So. 2d 1190 (Fla. 2006); a second successive state postconviction motion challenging, <u>inter alia</u>, the Sodium Pentothal Protocol under Florida Rule of Criminal Procedure 3.850, <u>see Jackson v. State</u>, 50 So. 3d 1137 (Fla. 2010); and a third successive state postconviction motion pursuant to <u>Hurst v. State</u>, 202 So. 3d 40 (Fla. 2016), <u>see Jackson v. State</u>, 237 So. 3d 905 (Fla. 2018). All of Jackson's successive state postconviction motions were denied.

[6] Anderson was also convicted of grand theft, armed robbery, and attempted first degree murder. <u>Anderson</u>, 863 So. 2d at 175.

**C. Brant**

On May 25, 2007, Brant entered a plea of guilty to the 2004 first degree murder, sexual battery, burglary with assault or battery, and kidnapping of Sara Radfar.[7] Brant v. State, 21 So. 3d 1276, 1277 (Fla. 2009). Brant waived his right to a penalty-phase jury, and instead the parties presented aggravating and mitigating evidence to the trial court. Id. at 1277. At the conclusion of the penalty phase, the trial court sentenced Brant to death. Id. at 1283. The Florida Supreme Court affirmed Brant's convictions and sentence on November 12, 2009. Id. at 1277. The record does not definitively reflect whether Brant filed a petition for writ of certiorari with the United States Supreme Court. However, Defendants assert that Brant's conviction and death sentence became final on February 10, 2010, see Brant Motion ¶ 25, and Brant has not contested that assertion.[8] Brant sought state postconviction relief, and the Florida Supreme Court affirmed denial of Brant's initial state motion for postconviction relief on June 30, 2016, see Brant v. Florida, 197 So. 3d 1051 (Fla. 2016). His initial federal habeas petition is currently pending in the Tampa Division of this Court, see Brant v. Sec'y, Dep't of Corr., No. 8:16-cv-2601-T-23JSS (M.D. Fla.).[9]

**D. Florida's Lethal Injection Protocols and Plaintiffs' § 1983 actions**

On January 14, 2000, the state of Florida adopted lethal injection as its primary

---

[7] Brant also plead guilty to grand theft of a motor vehicle. Brant, 21 So. 3d at 1277.

[8] For purposes of this Order, the Court accepts Defendants' representation that Brant's judgment and sentence became final on February 10, 2010.

[9] Brant's initial federal habeas action is currently stayed pending the resolution of Brant's ongoing state court proceedings seeking relief pursuant to Hurst v. Florida, 136 S. Ct. 616 (2016), and Hurst v. State, 202 So. 3d 40 (Fla. 2016). Brant, No. 8:16-cv-2601-T-23JSS (Docs. 18, 27).

method of execution for carrying out a death sentence. Sims v. State, 754 So. 2d 657, 664 n.11 (Fla. 2000). While Florida identifies the method of execution by statute, the legislature delegates the responsibility of establishing the specific procedures or drugs to be used to the FDOC. See Valle v. Singer, 655 F.3d 1223, 1227 (11th Cir. 2011). Since the adoption of lethal injection, Florida has used a three-drug lethal injection protocol. See id.; Muhammad v. State, 132 So. 3d 176, 195 (Fla. 2013); Lightbourne v. McCollum, 969 So. 2d 326, 344-46 (Fla. 2007). The FDOC's first three-drug lethal injection protocol provided for intravenous administration of (1) 5 grams of sodium pentothal, (2) 100 milligrams of pancuronium bromide, and (3) 240 milliequivalents of potassium chloride. Lightbourne, 969 So. 2d at 345 (Sodium Pentothal Protocol).

On December 10, 2010, Jackson filed his first federal § 1983 method-of-execution action challenging the constitutionality of the Sodium Pentothal Protocol. See Jackson v. Singer, No. 3:10-cv-1130-J-34MCR (M.D. Fla.) (Jackson I) (Doc. 1).[10] He filed an

---

[10] A Court may take judicial notice of its own records, and of public records within its own files. See Cash Inn of Dade, Inc. v. Metropolitan Dade County, 938 F.2d 1239, 1243 (11th Cir.1991) (district court may take judicial notice of public records within its files relating to particular case before it or to other related cases); ITT Rayonier, Inc. v. United States, 651 F.2d 343, 347 n.2 (5th Cir. 1981) (court may take judicial notice of its own records or of those of inferior courts); Kinnett Dairies, Inc. v. Farrow, 580 F.2d 1260, 1277 n.33 (5th Cir. 1978) (trial court did not err in taking judicial notice of materials in court's own files from prior proceedings); Hurd v. Durrand, No. 12-20899-CIV-MORENO, 2013 WL 1192351, at *7 (S.D. Fla. Jan. 24, 2013), report and recommendation adopted sub nom. Hurd v. Durant, No. 12-20899-CIV-MORENO, 2013 WL 1192342 (S.D. Fla. Mar. 22, 2013) (taking judicial notice of the inmate grievance procedure filed in previous action); Navarro v. City of Riviera Beach, 192 F. Supp. 3d 1353, 1364 (S.D. Fla. 2016) ("Courts may take judicial notice of public records, such as a pleading filed in another court, because such documents are 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'"). Notably, "judicial notice may be taken only to establish what those documents contain, not the veracity of their contents." Id. (citing Bryant v. Avado Brands, Inc., 187 F.3d 1271,1278 (11th Cir. 1999)).

amended complaint on April 13, 2011. See Jackson I (Doc. 10). In response to the amended complaint, Defendants filed a motion to dismiss arguing that the amended complaint should be dismissed because, among other reasons: (1) Jackson failed to properly exhaust his administrative remedies; (2) Jackson's claims were barred by the applicable statute of limitations; and (3) Jackson's challenge to the Sodium Pentothal Protocol was moot because the FDOC no longer intended to use the Sodium Pentothal Protocol for future executions. See generally id. (Doc. 13). As it turns out, on June 8, 2011, a little over a week before filing the motion to dismiss, the FDOC implemented a new lethal injection protocol that provided for the administration of (1) 2.5 grams of pentobarbital sodium, (2) 200 milligrams of pancuronium bromide, and (3) 480 milliequivalents of potassium chloride. See Valle v. State, 70 So. 3d 530, 538 (Fla. 2011) (Pentobarbital Protocol). As a result, the Court permitted Jackson to file an amended § 1983 complaint on March 16, 2012, in which he challenged the constitutionality of the Pentobarbital Protocol. See Jackson I (Doc. 18). In response to this amended complaint, Defendants again filed a motion to dismiss raising many of the same arguments, including that Jackson failed to exhaust his administrative remedies before filing suit and that his claims were barred by the statute of limitations. See generally id. (Doc. 24). Then, on September 4, 2012, the FDOC changed the second drug of its lethal injection protocol by substituting vecuronium bromide for pancuronium bromide. See Pardo v. State, 108 So. 3d 558, 561 (Fla. 2012) (Pentobarbital II Protocol). The Court again permitted Jackson to file an amended complaint no later than April 17, 2013. Jackson I (Docs. 31, 34). Defendants again responded to Jackson's complaint, arguing that dismissal of the action was warranted because Jackson failed to exhaust his administrative remedies and the

amended complaint was barred by the statute of limitations. See generally id. (Doc. 36).

On April 18, 2013, Anderson and Brant initiated their first federal § 1983 method-of-execution actions challenging the constitutionality of the Pentobarbital II Protocol. See Anderson v. Palmer, No. 3:13-cv-1431-J-32JBT (M.D. Fla.) (Anderson I) (Doc. 1);[11] Brant (Doc. 1). Defendants filed a motion to dismiss Anderson's complaint arguing it should be dismissed because, among other reasons: (1) Anderson's action was barred by the statute of limitations; (2) Anderson failed to properly exhaust his administrative remedies; and (2) Anderson's challenge to the Pentobarbital II Protocol failed to state a claim on which relief could be granted. Anderson I (Doc. 9). That same day, Defendants filed a similar motion to dismiss in response to Brant's complaint. See Brant (Doc. 10). Acknowledging that Brant initiated his action within the four-year statute of limitations, Defendants argued that his complaint should be dismissed because Brant failed to exhaust his administrative remedies and his complaint failed to state a claim upon which relief could be granted. See Brant (Doc. 10).

Less than six months later, on September 9, 2013, Florida implemented yet another new lethal injection protocol. The new protocol provided for intravenous administration of (1) 250 milligrams of midazolam hydrochloride, (2) 200 milligrams of vecuronium bromide, and (3) 480 milliequivalents of potassium chloride. See Muhammad v. State, 132 So. 3d 176, 204 (Fla. 2013) (Midazolam Protocol). In light of the change, Plaintiffs filed motions for leave to file amended complaints. See Jackson I (Doc. 44); Anderson I (Doc. 16); Brant (Doc. 21). Defendants filed responses in opposition arguing

---

[11] Anderson originally initiated his first action in the Ocala Division of the Middle District, but the Court transferred Anderson I to the Jacksonville Division on November 13, 2013. See Anderson I (Doc. 23).

that leave to amend would be futile because, inter alia, Plaintiffs had failed to exhaust their administrative remedies regarding the Midazolam Protocol before filing suit; Jackson and Anderson's actions were barred by the statute of limitations; and Brant's "proposed amendment add[ed] nothing to the existing complaint since the change of a single drug in Florida's lethal injection protocol [was] not a significant change." Brant (Doc. 23 at 1-2,11); Jackson I (Doc. 46 at 13); Anderson I (Doc. 17 at 13). Following a joint hearing on Jackson and Brant's motions for leave to amend, and to address some of the arguments presented, the Court directed Jackson and Brant to file renewed motions to amend, see Jackson I (Docs. 52, 53, 55); Brant (Docs. 30, 31, 33), and later directed Anderson to do the same, see Anderson I (Doc. 25).[12] Plaintiffs filed their renewed motions on January 6, 2014. See Jackson I (Doc. 56); Anderson I (Doc. 26); Brant (Doc. 34). Not surprisingly, Defendants filed similar responses opposing the filing of the amended complaints. See Jackson I (Doc. 58); Anderson I (Doc. 27); Brant (Doc. 35). The Court conducted a second hearing. See Jackson I (Docs. 67, 69); Anderson I (Doc. 34); Brant (Doc. 43). Thereafter, at the urging of the Court, given the repeated changes to the protocol and Defendants' challenges to the sufficiency of Plaintiffs' presuit exhaustion efforts, Jackson and Anderson agreed to dismiss their first § 1983 actions without prejudice, refile, and pursue their claims in new separate actions. See Jackson I (Doc. 68); Anderson I (Doc. 39).[13] The Court dismissed Jackson I without prejudice on August 15, 2014, see Jackson I (Doc.

_____

[12] The Court did not hear argument on Anderson's motion to amend because that case was not transferred to this Division until later.

[13] In agreeing to dismiss their actions, Jackson and Anderson did not concede that their exhaustion efforts were insufficient, and this Court did not make any factual findings regarding Jackson and Anderson's exhaustion efforts for the Midazolam Protocol. See Jackson I (Doc. 73); Anderson I (Doc. 39).

73), and dismissed <u>Anderson I</u> without prejudice on August 22, 2014, <u>see</u> <u>Anderson I</u> (Doc. 39). The Court deferred ruling on Brant's renewed motion for leave to file an amended complaint pending the resolution of an unrelated issue with counsel's representation and the completion of supplemental briefing on the issue of exhaustion. <u>Brant</u> (Doc. 46 at 2).

In September 2014, Jackson and Anderson initiated their current § 1983 actions by filing complaints challenging the Midazolam Protocol. <u>See</u> <u>Jackson II</u> (Doc. 1, Original Complaint); <u>Anderson II</u> (Doc. 1, Original Complaint).[14] The Court struck Jackson and Anderson's Original Complaints finding them to be improper shotgun pleadings, <u>see</u> <u>Jackson II</u> (Doc. 10); <u>Anderson II</u> (Doc. 10), and Jackson and Anderson filed their First Amended Complaints on December 1, 2014, <u>see</u> <u>Jackson II</u> (Doc. 14); <u>Anderson II</u> (Doc. 11). In early May 2015, at the parties' mutual request, the Court stayed all three actions pending the United States Supreme Court's decision in <u>Glossip v. Gross</u>, 135 S. Ct. 2726 (2015). <u>See</u> <u>Jackson II</u> (Doc. 26); <u>Anderson II</u> (Doc. 22); <u>Brant</u> (Doc. 61). Following the release of the <u>Glossip</u> decision, in November 2015, the Court briefly lifted the stays, <u>see</u> <u>Jackson II</u> (Doc. 29); <u>Anderson II</u> (Doc. 25); <u>Brant</u> (Doc. 65), but soon reinstated the stays in light of the United States Supreme Court's decision in <u>Hurst v. Florida</u>, 136 S. Ct. 616 (2016), and pending the Florida Supreme Court's resolution, on remand, of <u>Hurst v. State</u>, 202 So. 3d 40 (Fla. 2016), <u>see</u> <u>Jackson II</u> (Doc. 37); <u>Anderson II</u> (Doc. 32); <u>Brant</u> (Doc. 75). The Court continued the stays until the Florida Supreme Court determined whether the rule announced in <u>Hurst v. Florida</u> and/or <u>Hurst v. State</u> would apply retroactively. <u>See</u>

---

[14] The Court collectively refers to the initial Complaints filed in <u>Brant</u>, <u>Jackson II</u>; and <u>Anderson II</u> as Original Complaints.

Jackson II (Docs. 39, 47); Anderson II (Docs. 34, 42); Brant (Docs. 79, 87).

During one of these prolonged stays, on January 4, 2017, Florida implemented its most recent lethal injection protocol that changes all three drugs used in its previous Midazolam Protocol. See Amended Complaints Ex. A. Specifically, the newly adopted protocol provides for intravenous administration of (1) 200 milligrams of etomidate (a sedative), (2) 1000 milligrams of rocuronium bromide (a paralytic agent), and (3) 240 milliequivalents of potassium acetate (a substance to stop the heart). See id. (Etomidate Protocol). A saline solution is injected before a new drug is administered to clear the intravenous line between chemicals.

Following the Florida Supreme Court's resolution of the Hurst retroactivity question, and in light of the FDOC's implementation of the Etomidate Protocol, the Court reopened these cases on January 30, 2018, and directed Plaintiffs to file motions for leave to amend their complaints with proposed amended complaints. See Jackson II (Doc. 50); Anderson II (Doc. 45); Brant (Doc. 90). Plaintiffs filed their motions for leave to amend with attached proposed amended complaints on March 12, 2018. Jackson II (Doc. 51); Anderson II (Doc. 46); Brant (Doc. 91). Over Defendants' objection,[15] the Court granted Plaintiffs' motions. Jackson II (Doc. 61); Anderson II (Doc. 56); Brant (Doc. 101). Plaintiffs

---

[15] In opposing Plaintiffs' requests to file amended complaints, Defendants argued that any amendment would be futile, because: (a) Plaintiffs failed to properly exhaust their administrative remedies regarding the Etomidate Protocol before filing their Original Complaints; (b) the amended complaints were impermissible shotgun pleadings; (c) Anderson and Jackson's amendments were time barred; and (d) the amended complaints failed to state a constitutional claim upon which relief could be granted. See Brant (Doc. 98); Anderson II (Doc. 53); Jackson II (Doc. 58). In allowing Plaintiffs to file their Amended Complaints, the Court noted that Defendants were not precluded from raising their challenges to the merits of Plaintiffs' claims in a motion to dismiss. See Brant (Doc. 101); Anderson II (Doc. 56); Jackson II (Doc. 61).

filed their Amended Complaints challenging the Etomidate Protocol in December 2018. See Jackson SAC; Anderson SAC; Brant FAC. The instant Motions followed.

## III.   Plaintiffs' Claims

In their two-count Amended Complaints, Plaintiffs assert that Florida's Etomidate Protocol, both as written and as applied, poses a substantial risk of serious harm to Plaintiffs in violation of the Eighth Amendment's proscription against cruel and unusual punishment. See generally Amended Complaints.[16] In their first claim for relief, Plaintiffs assert that the drug combination used in the Etomidate Protocol raises a substantial risk that they will suffer unnecessary pain during the execution. Id. ¶¶ 70-73. According to Plaintiffs, to not suffer, or face a risk of suffering, etomidate must adequately and fully render them unconscious for the entire duration of the execution. Id. ¶ 31. They contend, however, that etomidate is an inadequate anesthetic because its ultra-short sedating effects are insufficient to ensure that they will remain unconscious and insensate to the paralytic properties of the second drug or the noxious stimuli of the third drug. See id. ¶¶ 32-33. Plaintiffs assert that if etomidate wears off before the execution is complete, they will experience a sense of suffocation or drowning after the administration of rocuronium bromide and then the intense burning sensation of potassium acetate before it stops the heart. Id. ¶ 43. In support of this claim, Plaintiffs offer the Declaration of Dr. David Lubarsky, see Amended Complaints Ex. C, in which Dr. Lubarsky opines that etomidate

---

[16] Plaintiffs also reference the Fourteenth Amendment. See Amended Complaints ¶ 2. Because the Amended Complaints do not appear to raise a separate and distinct Fourteenth Amendment claim, it appears that reference is for the proposition that the Eighth Amendment's proscription against cruel and unusual punishment is made applicable to the states through the Fourteenth Amendment. Wilson v. Seiter, 501 U.S. 294, 296-97 (1991).

has a re-distribution half-life of 2.7 minutes; thus, at the sixteenth minute of a seventeen-minute execution, the concentration of etomidate in the blood would be 1/64th of the original 200 milligram dose, see id. ¶ 16.

Plaintiffs further contend that etomidate causes severe pain upon injection and does not contain any analgesic properties. See Amended Complaints ¶¶ 36-38. Plaintiffs again cite to Dr. Lubarsky's Declaration which states that pain is associated with most etomidate injections and the prisoner will feel an intense pain as the entire 200 milligrams is pushed through the IV tube. See id. Plaintiffs also provide the Declaration of Robert Friedman who witnessed the February 22, 2018 execution of Eric Branch. See Amended Complaints Ex. D. According to reports, Branch "let out a 'blood-curdling' scream 'at the top of his lungs' immediately following the administration of etomidate." Amended Complaints ¶ 37.

Plaintiffs next assert that Defendants' written lethal injection protocol exacerbates the risk of serious harm associated with etomidate. Id. ¶ 72. According to Plaintiffs, the protocol fails to consider how etomidate's short-term anesthetic properties affect the consciousness test. Id. ¶¶ 53-54. They explain that etomidate causes involuntary movements, or myoclonus, that will make the consciousness check more difficult and time consuming. Id. ¶¶ 51-52. Plaintiffs provide the Declaration of Dr. J. Robert Sneyd to support their contention that the protocol does not require the execution personnel to understand the nuances of etomidate when conducting the consciousness check. See Amended Complaints Ex. G. Plaintiffs also allege that the mixing of rocuronium bromide and etomidate will cause precipitation, resulting in incomplete drug delivery and loss of the IV tube during the procedure. See Amended Complaints ¶¶ 32, 44. Plaintiffs again

cite to Dr. Lubarsky's Declaration to corroborate this allegation. <u>See</u> <u>id.</u> ¶ 44.

Lastly, in their first claim for relief, Plaintiffs maintain that the current protocol does not require training for execution personnel charged with carrying out specific lethal injection tasks. <u>Id.</u> ¶¶ 56-59. According to Plaintiffs, in the event peripheral venous access is not possible, "an advanced registered nurse practitioner" and a "physician's assistant" are not qualified to place a central line, and the protocol does not provide guidelines for the execution team to exercise discretion during the process. <u>Id.</u> ¶¶ 57-58. Plaintiffs further aver that the protocol does not allow for individualized assessment of each Plaintiffs' age, weight, or height, and it does not address the appropriate medical response to foreseeable complications. <u>Id.</u> ¶¶ 60-61. They contend that execution team members consistently and willfully fail to follow the written lethal injection protocol, and their policy of keeping information about their lethal injection procedure secret is unconstitutional. <u>Id.</u> ¶¶ 62-68.

In their second claim for relief, Plaintiffs contend that Defendants' refusal to adopt a one-drug protocol violates the evolving standards of decency encompassed in the Eighth Amendment. <u>Id.</u> ¶¶ 74-81. According to Plaintiffs, most states that still recognize the death penalty have switched to a one-drug protocol, and seventy percent of the executions completed in 2018 did not include the use of a paralytic. <u>Id.</u> ¶ 76. Plaintiffs identify "a single dose of non-compounded or properly compounded pentobarbital as the readily available alternative to the [s]tate of Florida's current unconstitutional protocol." <u>Id.</u> ¶ 79. Plaintiffs aver that other states such as Texas, Missouri, Georgia, and South Dakota have the ability to obtain properly compounded pentobarbital and have used this

proposed single dose of pentobarbital to execute a combined sixty-six[17] condemned inmates. Id. ¶ 80. They additionally contend that California and Kentucky have recently proposed one-drug protocols demonstrating a national consensus toward this alternative procedure. Id. Plaintiffs assert that a single dose of pentobarbital is a feasible, readily available alternative that would significantly reduce the substantial risk associated with Florida's three-drug protocol. Id. ¶¶ 77, 79.

## IV.    **Motion to Dismiss Standard**

In ruling on a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). In addition, all reasonable inferences should be drawn in favor of the plaintiff. See Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010). Nonetheless, the plaintiff must still meet some minimal pleading requirements. Jackson v. Bellsouth Telecomm., 372 F.3d 1250, 1262-63 (11th Cir. 2004) (citations omitted). Indeed, while "[s]pecific facts are not necessary[,]" the complaint should "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Further, the plaintiff must allege "enough facts to state a claim that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable

---

[17] Jackson, who filed his Second Amended Complaint before Brant and Anderson, alleges that these states have executed a combined sixty-four prisoners using this proposed one-drug protocol.  Jackson SAC ¶ 80.

inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" Twombly, 550 U.S. at 555 (internal quotations omitted); see also Jackson, 372 F.3d at 1262 (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal") (internal citation and quotations omitted). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" which simply "are not entitled to [an] assumption of truth." See Iqbal, 556 U.S. at 678, 680. Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[.]'" Id. at 678 (quoting Twombly, 550 U.S. at 570).

## V.     **Summary of the Arguments**

In their Motions, Defendants argue that the Court should dismiss Plaintiffs' Amended Complaints because: (a) Plaintiffs failed to properly exhaust their administrative remedies before filing suit; (b) Anderson and Jackson's Amended Complaints are barred by the statute of limitations;[18] and (c) Plaintiffs fail to state an Eighth Amendment claim upon which relief can be granted. See generally Motions. In response, Plaintiffs argue that they exhausted their administrative remedies, but nevertheless, contend that they were not required to exhaust administrative remedies as to their lethal injection

---

[18] As previously noted Defendants do not raise a statute of limitations defense in Brant. See Brant Motion ¶ 25.

challenges because no such remedy was "available." See Responses at 2-14. They also assert that they state a plausible Eighth Amendment claim against Defendants, see Brant Response at 14-21; Jackson Response at 17-24; Anderson Response at 17-24, and Anderson and Jackson maintain that their actions are not barred by the statute of limitations because the January 4, 2017 Etomidate Protocol constituted a significant change from Florida's prior procedure, see Jackson Response at 14-17; Anderson Response at 14-17.

**VI.** <u>**Analysis**</u>

### A. Exhaustion

The Prison Litigation Reform Act (PLRA) requires exhaustion of available administrative remedies before a 42 U.S.C. § 1983 action with respect to prison conditions may be initiated in a district court by a prisoner. See 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 . . . until such administrative remedies as are available are exhausted."); see also <u>Woodford v. Ngo</u>, 548 U.S. 81, 92-93 (2006) (noting that a prisoner must exhaust administrative remedies before challenging the conditions of confinement, and concluding that the PLRA demands "proper exhaustion"). An inmate raising a § 1983 method-of-execution action is not excused from this exhaustion prerequisite. See <u>Hill v. McDonough</u>, 547 U.S. 573, 579 – 80 (2006) (finding inmate's § 1983 action to enjoin defendants from executing him in manner they intended is a challenge to conditions of confinement); see also <u>Nelson v. Campbell</u>, 541 U.S. 637, 650 (2004) (noting inmate bringing method-of-execution claim under § 1983 is subject to state administrative exhaustion rules); <u>see, e.g.</u>, <u>Blankenship v. Owens</u>, No. 1:11-cv-429-TCB, 2011 WL 610967, at *5 (N.D. Ga. Feb. 15, 2011) (finding

exhaustion of § 1983 lethal injection challenge was required under Georgia law). Nevertheless, prisoners are not required to "specially plead or demonstrate exhaustion in their complaints." See Jones v. Bock, 549 U.S. 199, 216 (2007). Instead, the United States Supreme Court has recognized that "failure to exhaust is an affirmative defense under the PLRA[.]" Id.

Importantly, exhaustion of available administrative remedies is "a precondition to an adjudication on the merits." Bryant v. Rich, 530 F.3d 1368, 1374 (11th Cir. 2008). See also Jones, 549 U.S. at 211. The Supreme Court has instructed that while "the PLRA exhaustion requirement is not jurisdictional[,]" Woodford, 548 U.S. at 101, "exhaustion is mandatory . . . and unexhausted claims cannot be brought," Pavao v. Sims, 679 F. App'x 819, 823 (11th Cir. 2017) (per curiam) (citing Jones, 549 U.S. at 211). Not only is there a recognized exhaustion requirement, "the PLRA . . . requires proper exhaustion" as set forth in the applicable administrative rules and policies of the institution. Woodford, 548 U.S. at 93.

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)."

Id. at 90 (citation omitted). Indeed, "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules[.]" Id.

In Ross v. Blake, the Supreme Court instructed that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.

The only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'" 136 S. Ct. 1850, 1862 (2016). For an administrative remedy to be available, the "remedy must be 'capable of use for the accomplishment of [its] purpose.'" Turner v. Burnside, 541 F.3d 1077, 1084 (11th Cir. 2008) (quoting Goebert v. Lee Cty., 510 F.3d 1312, 1322-23 (11th Cir. 2007)). In Ross, the Court identified three circumstances in which an administrative remedy would be considered "not available." Ross, 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. Next, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Finally, a remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

Because failure to exhaust administrative remedies is an affirmative defense, the defendant bears "the burden of proving that the plaintiff has failed to exhaust his available administrative remedies." Turner, 541 F.3d at 1082. The Eleventh Circuit has articulated a two-step process that district courts must employ when examining the issue of exhaustion of administrative remedies.

> In Turner v. Burnside we established a two-step process for resolving motions to dismiss prisoner lawsuits for failure to exhaust. 541 F.3d at 1082. First, district courts look to the factual allegations in the motion to dismiss and those in the prisoner's response and accept the prisoner's view of the facts as true. The court should dismiss if the facts as stated by the prisoner show a failure to exhaust. Id. Second, if dismissal is not warranted on the prisoner's view of the facts, the court makes specific findings to resolve disputes of fact, and should dismiss if, based on those findings, defendants

have shown a failure to exhaust. Id. at 1082–83; see also id. at 1082 (explaining that defendants bear the burden of showing a failure to exhaust).

Whatley v. Warden, Ware State Prison, 802 F.3d 1205, 1209 (11th Cir. 2015).

The FDOC provides inmates with a three-step grievance process for exhausting administrative remedies. As the Eleventh Circuit has described it:

> The grievance procedure applicable to Florida prisoners is set out in § 33-103 of the Florida Administrative Code. Section 33-103 contemplates a three-step sequential grievance procedure: (1) informal grievance; (2) formal grievance; and then (3) administrative appeal. Dimanche, 783 F.3d at 1211. Informal grievances are handled by the staff member responsible for the particular area of the problem at the institution; formal grievances are handled by the warden of the institution; and administrative appeals are handled by the Office of the Secretary of the FDOC. See Fla. Admin. Code. §§ 33-103.005–103.007. To exhaust these remedies, prisoners ordinarily must complete these steps in order and within the time limits set forth in § 33-103.011, and must either receive a response or wait a certain period of time before proceeding to the next step. See id. § 33-103.011(4).

Pavao, 679 F. App'x at 824.

Here, Defendants assert that Plaintiffs failed to properly exhaust their administrative remedies. Motions ¶¶ 5-22. They do not dispute that each Plaintiff filed an informal grievance, a formal grievance, and an appeal of the denials of their grievances regarding the January 4, 2017 Etomidate Protocol, and they recognize that each Plaintiff provided the Court with copies of those grievances and appeals when each filed his

Amended Complaint.[19] Id. ¶ 8. Nevertheless, Defendants argue that each Plaintiff's

failure to complete the three-step grievance process regarding the newly adopted

Etomidate Protocol prior to the filing of his Original Complaint renders his claims incurably

unexhausted. Id. ¶¶ 7-8.[20] As support for this proposition, Defendants quote McDaniel v.

Crosby, 194 F. App'x 610, 613 (11th Cir. 2006), in which the Eleventh Circuit, in an

unpublished decision, stated

> to the extent McDaniel relies on the grievances and appeals
> he submitted after filing his initial complaint, such grievances
> and appeals cannot be used to support his claim that he

---

[19] Jackson provides the Court with a copy of an informal grievance, a formal grievance, an appeal, and the FDOC's responses to these grievances and appeal. See Jackson SAC Ex. B. Brant also provides the Court with a copy of an informal grievance, a formal grievance, an appeal, and the FDOC's responses to his grievances and appeal. See Brant FAC Ex. B. Anderson provides the Court with a copy of an informal grievance, the FDOC's response to his informal grievance, the FDOC's response to his formal grievance, and a copy of his appeal. See Anderson SAC Ex. B. Anderson states that he never received the Secretary's denial of his appeal. See Anderson Response at 8 n.4. Nevertheless, Defendants do not argue that they did not receive Anderson's appeal nor do they argue that Anderson failed to complete the three-step grievance process.

[20] In addition to contending that the grievances challenging the new protocol had to be submitted before the lawsuits were filed, Defendants argue Plaintiffs failed to exhaust because the grievances Plaintiffs submitted to the FDOC regarding the Etomidate Protocol were factually insufficient. Specifically, they contend the grievances were "conclusory in nature and lack[ed] any factual support that would provide notice to the department" of the specific claims Plaintiffs were attempting to grieve. Motions ¶ 13. They assert that Plaintiffs "cannot be considered to have exhausted [their] administrative remedies when [they have] not presented all of [their] issues to the Department of Corrections and given the department an opportunity to address them." Motions ¶ 21. However, as Plaintiffs correctly note in their Responses, "[a]n inmate complies with the exhaustion requirement 'as long as the inmate's grievance provides sufficient detail to allow prison officials to investigate the alleged incident.'" Responses at 8 (quoting Maldonado v. Unnamed Defendant, 648 F. App'x 939, 953 (11th Cir. 2016)). Notably, in challenging the Etomidate Protocol, Plaintiffs pointed to the short-lasting anesthetic effects of etomidate, explained that it is not suitable as the first drug in the three-drug protocol, and stated that the written protocol increases the deficiencies associated with etomidate. See Amended Complaints Ex. B. The Court finds that Plaintiffs' grievances provided sufficient detail to notify prison officials that they were grieving the constitutionality of the Etomidate Protocol, and thus, this argument is unavailing.

> exhausted his administrative remedies, because satisfaction of the exhaustion requirement was a precondition to the filing of his suit, and thus, must have occurred before the suit was filed.

See Motions ¶ 7 (quoting McDaniel, 194 F. App'x at 613) (citing Alexander v. Hawk, 159 F.3d 1321, 1325-26 (11th Cir. 1998)). Defendants also rely on Smith v. Terry, 491 F. App'x 81 (11th Cir. 2012), another unpublished Eleventh Circuit decision, in which the court concluded that a supplemental complaint did not "cure" the defects present when the case was initiated because "[t]he only facts pertinent to determining whether a prisoner has satisfied the PLRA's exhaustion requirement are those that existed when he filed the original complaint." Motions ¶ 7 (citing Smith, 491 F. App'x at 83).

In their Responses, Plaintiffs assert that Defendants' reliance on McDaniel and Smith is unavailing because both cases are based on a distinguishable set of facts. Responses at 7-8. Specifically, Plaintiffs argue that both McDaniel and Smith involved plaintiffs who filed their original complaints before they had fully exhausted their administrative remedies as to the claims raised in those complaints and the court determined that their post filing exhaustion efforts could not cure their presuit failure to exhaust as to those claims. See id. In contrast, according to Plaintiffs, they did not file their Amended Complaints to "cure" any technical defect present when they initiated their actions. See id. at 3. Instead, they assert that in their Amended Complaints they set forth claims that did not exist until after each case was initiated and argue that they should be permitted to amend their complaints in these actions to assert those new claims which are fully exhausted. See id. at 3-6.

Although Defendants challenged the factual sufficiency of Brant's grievances regarding the Pentobarbital II Protocol, see Brant (Doc. 10 at 4-5), and they similarly

challenged the factual sufficiency of Anderson and Jackson's grievances regarding the Midazolam Protocol, see Anderson II (Doc. 9 at 5-13); Jackson II (Doc. 9 at 5-13), the Court finds these challenges, like Defendants' challenges to the factual sufficiency of the Etomidate Protocol, see supra n. 20, to be unavailing. Defendants do not suggest that Plaintiffs otherwise failed to accomplish each step in the FDOC grievance procedure in a timely manner. Thus, it is undisputed that all three Plaintiffs completed the FDOC's three-step grievance process regarding those prior lethal injection protocols before filing their Original Complaints. While Brant's challenge to the Pentobarbital II Protocol was pending, the FDOC abandoned that protocol, replaced it with the Midazolam Protocol, and then again replaced it with the Etomidate Protocol. Likewise, after Jackson and Anderson initiated their instant actions, the FDOC abandoned the Midazolam Protocol and replaced it with the Etomidate Protocol. In light of the adoption of the Etomidate Protocol, the FDOC argued that Plaintiffs' claims challenging the Midazolam Protocol were moot. Brant (Doc. 89 at 5); Anderson II (Doc. 44 at 6); Jackson II (Doc. 49 at 5-6). In response, after completing the three steps of the FDOC's grievance procedure with regard to the Etomidate Protocol, Plaintiffs sought and were granted leave to file their Amended Complaints to assert their challenges to the Etomidate Protocol in their individual pending actions.

Plaintiffs maintain that the events giving rise to their current cause of action (i.e., the January 4, 2017 unilateral adoption of the Etomidate Protocol) occurred after they filed their Original Complaints, and Defendants' argument that any one of them "could have and should have exhausted a protocol before it existed is an unduly restrictive and inaccurate reading of the [PLRA] as well as a misinterpretation of the relevant law."

Responses at 3. According to Plaintiffs, Defendants' interpretation of the PLRA exhaustion requirement allows them to make repeated "changes in their lethal injection protocol until a potential Plaintiff is outside the statute of limitations, then argue that none of the changes made were substantial and that the Plaintiff did not exhaust the new protocols before they existed, and therefore keep their methods of execution immune from legal challenge." Id. at 6-7. In the alternative, Plaintiffs argue that they were not required to exhaust their administrative remedies because no such remedy was "available." Id. at 11-14.

Upon review of the applicable authority and the arguments of the parties, the Court rejects Defendants' hypertechnical and restrictive reading of the PLRA's exhaustion requirement. It is true that the Eleventh Circuit has repeatedly stated that the PLRA requires a prisoner to exhaust all available administrative remedies before filing a § 1983 action. See Harris v. Garner, 216 F.3d 970, 974 (11th Cir. 2000); Miller v. Tanner, 196 F.3d 1190, 1193 (11th Cir. 1999); Brown v. Sikes, 212 F.3d 1205, 1207 (11th Cir. 2000). And it is also true that the Eleventh Circuit has instructed that "[t]he time the [PLRA] sets for determining whether exhaustion of administrative remedies has occurred is when the legal action is brought, because it is then that the exhaustion bar is to be applied." Goebert, 510 F.3d at 1324. However, in none of these cases did the Court of Appeals address the precise issue before the Court here – whether a prisoner who filed a civil action after fully exhausting all applicable administrative remedies can later amend that action to include new fully exhausted claims that arose after the action was initially filed. See Harris, 216 F.3d at 974, 981-82 (determining that the applicability of the PLRA's personal injury requirement depends on the confinement status of the prisoner at the time

the suit is "initiated" and rejecting the contention that the filing of an amended complaint could change that "historical fact" of whether the prisoner had been confined on that date or not); Miller, 196 F.3d at 1193-94 (determining that an inmate's presuit exhaustion efforts were sufficient despite the defendant's contention that the inmate's failure to sign and date the grievance rendered it inadequate); Brown, 212 F.3d at 1210 (rejecting contention that prisoner's presuit exhaustion efforts were insufficient based on his failure to specifically name the later-sued defendant in his grievance); Goebert, 510 F.3d at 1323 (excusing presuit failure to exhaust after finding that the appeal procedure was unknown to the inmate and thus unavailable).

Notably, in Goebert, the court focused the inquiry on the time the suit was filed in response to the defendants' contention that the plaintiff should have completed the exhaustion process after filing suit. Goebert, 510 F.3d at 1323. Specifically, the defendants had argued that the inmate plaintiff failed to fully exhaust because she did not appeal the captain's response to her complaint seeking urgent medical care. Id. at 1322. However, because the appeal procedure was not known to the inmate, the Eleventh Circuit found it to be unavailable, thus, excusing her failure to exhaust. Id. at 1323 ("That which is unknown and unknowable is unavailable, . . ."). In doing so, the court rejected the defendants' contention that the inmate plaintiff should have pursued an appeal after learning of the appeal procedure during the discovery after she filed suit. Id. at 1323-24. It was in rejecting this argument – that Goebert could/should have cured an alleged presuit failure to exhaust by pursuing the appeal while in litigation – that the court emphasized the need to focus the exhaustion inquiry on the time the suit was initiated. Although each of the above cited cases broadly addressed the time for completing

exhaustion, none addressed the fate of a claim that arises after a suit has been filed. Defendants' reliance on McDaniel and Smith is similarly unconvincing because they too only address the question of exhaustion in the case of a prisoner who raised unexhausted claims in the original complaint and, under those circumstances, concluded that the claims could not be salvaged by exhaustion efforts completed after the lawsuit was initiated. See McDaniel, 194 F. App'x at 613; Smith, 491 F. App'x at 83.

Defendants do not cite any decision from the Eleventh Circuit in which the court has interpreted the PLRA to require presuit exhaustion in the circumstances presented here. However, two district courts within the Eleventh Circuit have considered the issue in the context of adding new fully exhausted claims to an ongoing civil action and have rejected Defendants' restrictive interpretation of the PLRA. See Shaw v. Hall, No. 5:12-cv-0135-CAR-MSH, 2013 WL 5571235 (M.D. Ga. Oct. 9, 2013); Romano v. Sec'y, DOC, No. 2:06-cv-375-FtM-29DNF, 2011 WL 1790125 (M.D. Fla. May 10, 2011). In both cases, plaintiffs who had properly exhausted the claims raised in their original complaints sought leave to amend to include the new claims that arose subsequent to the original filing and for which they had completed the applicable exhaustion process. See Romano, 2011 WL 1790125, at *3-4; Shaw, 2013 WL 5571235, at *9-10. In Romano, the court concluded that

> the exhaustion requirement of the PLRA only required Plaintiff to fully and properly exhaust the new claims prior to the time he filed his amended complaint that included the new claims. This is consistent with the reasoning employed by the Jones [v. Bock, 549 U.S. 199 (2007),] Court when they expressly rejected the argument that the "no action shall be brought" language was synonymous with no complaint shall be brought.

Romano, 2011 WL 1790125, at *4 (citing Jones, 549 U.S. at 220-21). In Shaw, the court

similarly explained that

> Defendants are correct that an amended complaint will not typically cure the failure to exhaust administrative remedies prior to filing suit. However, Defendants have not persuaded the Court that the exhaustion requirement in 42 U.S.C. § 1997e(a) bars all supplemental claims pertaining to events occurring after an action is filed.

Shaw, 2013 WL 5571235, at *10 (citations omitted).[21]

District courts are not alone in reaching this conclusion. The Third, Fifth, Sixth, Seventh, and Ninth Circuit Courts of Appeals generally agree, albeit allowing the addition of the newly exhausted claims for different reasons. See Mattox v. Edelman, 851 F.3d 583, 592-93 (6th Cir. 2017) (holding "that the PLRA and [Fed. R. Civ. P. 15] permit a plaintiff to amend his complaint to add claims that were exhausted after the commencement of the lawsuit, provided that the plaintiff's original complaint contained at least one fully exhausted claim"); Boone v. Nose, 530 F. App'x 112, 115 n.1 (3d Cir. 2013) (noting that "prisoners may file supplemental complaints if the claims in question . . . have truly accrued since the beginning of the suit and . . . are exhausted per 42 U.S.C. § 1997e(a) before the supplement is filed"); Smith v. Olsen, 455 F. App'x 513, 515-16 (5th Cir. 2011) (reversing dismissal of claims raised in a second amended complaint which plaintiff had exhausted during the pendency of the action); Rhodes v. Robinson, 621 F.3d

---

[21] Other district courts also have read the PLRA to permit, in appropriate circumstances, the addition of new fully exhausted claims to a pending prisoner suit. See Ortiz v. Solomon, No. 5:15-CT-3251, 2018 WL 505076, at *3 (E.D.N.C. Jan. 22, 2018); Mora v. Chapa, No. 2:14-CV-343, 2017 WL 9249488, at *5 (S.D. Tex. Jan. 9, 2017); Pinet v. Zickefoose, No. CIV.A. 10-2347, 2013 WL 6734241, at *9 (D.N.J. Dec. 19, 2013), report and recommendation adopted, 2017 WL 1173752 (S.D. Tex. Mar. 30, 2017); Brown v. Warden, Ross Corr. Inst., No. 2:10-cv-822, 2012 WL 3527274, at *12-13 (S.D. Ohio Aug. 15, 2012), report and recommendation adopted, 2012 WL 3962817 (S.D. Ohio Sept. 11, 2012); Lee v. Birkitt, No. 09-10723, 2009 WL 3465210, at *2 (E.D. Mich. Oct. 23, 2009).

1002, 1005 (9th Cir. 2010) (holding "[d]efendants' argument that the PLRA requires the newly-added claims in the SAC to have been exhausted before the original complaint was 'brought' . . . fails because it ignores the general rule of pleading that the SAC completely supersedes any earlier complaint, rendering the original complaint non-existent and, thus, its filing date irrelevant"); and Barnes v. Briley, 420 F.3d 673, 678-79 (7th Cir. 2005) (holding, in action originally brought under Federal Tort Claims Act, that "filing of amended complaint [containing newly accrued § 1983 claims] was functional equivalent of filing new complaint . . . and it was only at that time that it became necessary to have exhausted the administrative remedies" for new claims.) This Court is persuaded by these authorities, as well as the reasoning in Romano and Shaw, that a prisoner such as Brant, Anderson, and Jackson, who fully exhausts a claim before filing suit, may amend his complaint to add a later arising, related claim providing the prisoner first fully exhausts his administrative remedies as to that new claim.

This conclusion is particularly appropriate in the context of challenges to a method of execution. As Plaintiffs note, Defendants' seemingly simple position could ultimately thwart any judicial review of an Eighth Amendment challenge to a state's method of execution. State defendants, such as the FDOC, wholly control the process and timing of implementing a new lethal injection protocol; and they have a recognized penological interest in keeping information about current and future lethal injection procedures confidential. See §§ 922.105(7), 945.10(1)(g), Fla. Stat.; see, e.g., Valle, 655 F.3d at 1237 n.13 (adopting district court's conclusion that no due process violation in the FDOC's refusal to reveal information about the training of the execution team and the source or vendor history of the lethal injection drugs); Sims, 754 So. 2d at 670 (holding that

"determining the methodology and the chemicals to be used are matters best left to the Department of Corrections . . . "); see also Powell v. Thomas, 641 F.3d 1255, 1257–58 (11th Cir. 2011) (holding Alabama inmate did not have due process right to receive notice about changes to execution protocol); cf. Ray v. Comm., Ala. Dep't of Corr., 915 F.3d 689, 703 (11th Cir. 2019) (granting stay of execution because confidential nature of Alabama's execution procedure prevented the plaintiff from raising RLUIPA claim at earlier time). As such, a state can make repeated changes to its lethal injection protocol at any time and without any notice. Accepting Defendants' position in this action would then require a prisoner with a pending method-of-execution challenge to dismiss that suit, exhaust his administrative remedies again, and then initiate a new action each time a state adopts a new protocol without warning. But interpreting the PLRA in this manner could eventually erect an insurmountable statute of limitations defense, even if at the time the prisoner first filed his method-of-execution challenge he did so well within the applicable statute of limitations as Brant appears to have done here.

The statute of limitations for challenging a method of execution begins to run not from the date of "any" change to the method, but rather from the date on which the prisoner "becomes subject to a new or substantially changed execution protocol." McNair v. Allen, 515 F.3d 1168, 1174 (11th Cir. 2008). Here, Defendants contend that their adoption of the Etomidate Protocol "does not constitute a major change" from the previous protocol, and thus, does not restart the statute of limitations for Jackson and Anderson. See Anderson Motion ¶¶ 25-26; Jackson Motion ¶¶ 25-26. Nevertheless, they argue that Plaintiffs' fully exhausted challenges to the Midazolam Protocol became moot when the FDOC changed the protocol and they must each initiate a new lawsuit to challenge the

Etomidate Protocol after exhausting their administrative remedies. See Anderson II (Doc. 33 at 6); Anderson Motion ¶ 8; Jackson II (Doc. 49 at 5-6); Jackson Motion ¶ 8.[22] In other words, the Etomidate Protocol is so new that Plaintiffs must initiate a new lawsuit to challenge it, but it is not so new as to restart the statute of limitations. Defendants contradictory positions in these cases demonstrate the impossible barrier that their interpretation of the PLRA could create.

Brant's case is an example of this very circumstance. Defendants recognized Brant's method-of-execution action was timely filed and not subject to a statute of limitations defense, see Brant (Doc. 10 at 4). An amended complaint challenging the revised Etomidate Protocol in his action would likely relate back to the initial filing date under Rule 15 of the Federal Rules of Civil Procedure, and thus, similarly not subject Brant's claim to a statute of limitations obstacle. Indeed, in the Brant Motion, Defendants do not assert a statute of limitations argument. See Brant Motion ¶ 25. Yet, by contending that Brant must exhaust all administrative remedies for all claims, even those arising later, before challenging the Etomidate Protocol in any lawsuit, Defendants would require Brant to abandon this timely filed action and file a new one. That later filed action would then undoubtedly face the same statute of limitations defense asserted in Anderson II and Jackson II.

The PLRA was created to "reduce the quantity and improve the quality of prisoner suits." Porter v. Nussle, 534 U.S. 516, 524 (2002). It was not intended to create a

---

[22] Notably, if indeed, the Etomidate Protocol is not a substantially changed method of execution, it seems that Plaintiffs would not be required to initiate a new grievance process as prisoners are not required to repeatedly grieve a "continuous offense." See Parzyck v. Prison Health Servs., Inc., 627 F.3d 1218, 1219 (11th Cir. 2010).

complete barrier to review of a state's chosen method of execution. Accepting Defendants' position would mean that a prisoner such as Brant might never be able to accomplish proper exhaustion in a timely manner and a state could ultimately shield its lethal injection protocol from any judicial review. Such was not the purpose of the PLRA. Indeed, where the only issue presented to the Court is a clearly focused § 1983 constitutional claim, and where Defendants simultaneously seek dismissal of these claims on the merits, see Anderson Motion ¶¶ 27-63; Jackson Motion ¶¶ 27-63; Brant Motion ¶¶ 26-62, forcing Plaintiffs to file their Amended Complaints in a new case would do nothing but confound the PLRA's goal to promote efficiency in the resolution of prisoner claims. See Porter, 534 U.S. at 524 ("Beyond doubt, Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits.").

Further, requiring Plaintiffs to initiate a new case will not resolve these disputes. The frequency with which the FDOC amends its lethal injection protocol coupled with the ever-evolving precedent regarding Florida's death penalty scheme has hindered the Court's ability to efficiently resolve these lethal injection challenges. Indeed, since adopting lethal injection as its primary means of execution, Florida has amended the drug combination of its protocol four times. In his first § 1983 method-of-execution action, Jackson filed a new complaint each time the FDOC issued an amended protocol. See generally Jackson I. When Florida implemented the Pentobarbital II Protocol, Brant and Anderson initiated their first § 1983 method-of-execution actions. See Brant; Anderson I. Subsequently, Florida adopted the Midazolam Protocol, causing Brant to seek leave to file an amended complaint, see Brant (Doc. 21), and Jackson and Anderson to initiate their current actions in an attempt to avoid the very exhaustion argument Defendants now

raise, see Jackson II (Original Complaint); Anderson II (Original Complaint). But for the timely nature of Brant's case, he too would have likely initiated a new action. But all of these efforts have been in vain as the FDOC again amended its lethal injection procedure, adopting the current Etomidate Protocol, and prompting Plaintiffs' Amended Complaints. See Amended Complaints. As death-sentenced inmates, Plaintiffs have been subject to each version of the FDOC's lethal injection procedure, and until their sentences are carried out, they will be subject to any future version of the protocol. They have diligently pursued their remedies, and due to no fault of their own, they have yet to receive a merits determination on any of their § 1983 complaints challenging Florida's lethal injection procedures.[23] As such, requiring Plaintiffs to initiate a second or third § 1983 method-of-execution action would likely result in Plaintiffs eventually being required to initiate a third or fourth; a situation strikingly similar to the "capable of repetition, yet evading review" exception to the mootness doctrine. See Sierra Club v. Martin, 110 F.3d 1551, 1554 (11th Cir. 1997) (holding "capable of repetition, yet evading review exception" applies to mootness if "(1) there [is] a reasonable expectation or demonstrated probability that the same controversy will recur involving the same complaining party, and (2) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration").

For all the above reasons, the Court declines to accept Defendants' narrow

---

[23] Plaintiffs' diligent efforts are in stark contrast to those of other death-sentenced plaintiffs who have filed § 1983 actions in the eleventh hour after a death warrant is issued. Perhaps ironically, but certainly understandably, in those exigent circumstances, courts have turned to a merits analysis and pretermitted a determination of exhaustion arguments. See Long v. Inch, No. 8:19-cv-1193-MSS-AEP (M.D. Fla. May 19, 2019) (Doc. 21 at 15 n.5); Chavez v. Palmer, No. 3:14-cv-110-J-39JBT, 2014 WL 521067, at *23 (M.D. Fla. Feb. 10, 2014); Muhammad v. Crews, No. 3:13-cv-1587-J-32JBT, 2013 WL 6844489, at *12 n.9 (M.D. Fla. Dec. 27, 2013).

construction of the PLRA, which would never allow a prisoner to add a newly accrued fully exhausted claim to an ongoing lawsuit. Rather, where, as here, a prisoner files a fully exhausted § 1983 challenge to a state's method of execution, and the state later changes its method of execution, the PLRA will not bar the filing of an amended complaint adding a properly exhausted challenge to the new method of execution. Thus, the challenges to the Etomidate Protocol by Anderson, Jackson, and Brant, which were fully exhausted before they filed the Amended Complaints, are not subject to dismissal for failure to exhaust.

Nevertheless, even if the Court's interpretation of the PLRA's exhaustion requirement is in error, Plaintiffs' claims regarding the unavailability of their administrative remedies, taken as true, precludes dismissal of this action at the first step of the Turner analysis. See Ross, 136 S. Ct. at 1860. As such, the Court will proceed to Turner's second step and make specific findings to resolve the disputed factual issues related to exhaustion. See Jackson v. Griffin, 762 F. App'x 744, 746 (11th Cir. 2019) (holding disputes about availability of administrative remedies are questions of fact that can bar dismissal at Turner's first step).

Despite their good faith prior exhaustion efforts, Plaintiffs argue that they actually were not required to exhaust administrative remedies as to their challenges to the FDOC's lethal injection protocol because no such remedy was "available." Responses at 12. They maintain that there were no available remedies because "(a) Defendants have repeatedly responded to prisoner grievances on this subject by denying any authority to change Florida's lethal injection policies and (b) exhaustion would be futile inasmuch as Defendants have repeatedly stated that the Etomidate Protocol is lawful." Amended

Complaints ¶ 18. They aver that "Defendants' grievance procedure for a method-of-execution challenge operates as a simple dead end," because even though the FDOC has "apparent authority" to grant such administrative relief, the officials "decline ever to exercise" such authority. Responses at 12.

Defendants do not specifically address Plaintiffs' unavailability argument in their Motions. See generally Motions. Instead, they contend that "futility and inadequacy exceptions may not be applied to excuse the PLRA's mandatory exhaustion requirement." Motions ¶ 9. Nevertheless, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates," such as when "a prison handbook directs inmates to submit their grievances to a particular administrative office – but in practice that office disclaims the capacity to consider those petitions." Ross, 136 S. Ct. at 1859. In such a circumstance, the procedure provided is not "'capable of use' for the pertinent purpose." Id. Notably, "some redress for a wrong is presupposed by the statute's requirement' of an 'available remedy' . . . ." Id. (quoting Booth v. Churner, 532 U.S. 731, 736 (2001)). "When the facts on the ground demonstrate that no such potential [to obtain relief] exists, the inmate has no obligation to exhaust the remedy." Id.

In considering the availability of administrative remedies for Plaintiffs' method-of-execution claims under the PLRA, the Court notes the blanket rejections the FDOC issued when addressing each of the Plaintiffs' grievances. In denying Brant's grievances regarding the Pentobarbital II Protocol, the FDOC simply stated "[t]he Dept. of Corrections['] lethal injection procedure does not violate state or federal constitutional

standards. It is a valid and legal method of execution." <u>Brant</u> (Doc. 44-1 at 2). When the FDOC denied Brant's grievances regarding the Midazolam Protocol, it again explained "[t]he Department of Corrections['] lethal injection procedure does not violate state or federal constitutional standards. It is a valid and legal method of execution." <u>Id.</u> (Doc. 44-2 at 2). Similarly, in denying Jackson's grievances regarding the Midazolam Protocol, the FDOC asserted "[t]he Department of Corrections['] lethal injection procedure does not violate state or federal constitutional standards. It's a valid and legal method of execution." <u>Jackson II</u> (Doc. 1-2 at 2, 4, 6). Again, in denying Anderson's grievances regarding the Midazolam Protocol, the FDOC stated "[t]he Department of Corrections['] lethal injection procedure does not violate state or federal constitutional standards. It is a valid and legal method of execution." <u>Anderson II</u> (Doc. 1-3).

Four years later, in denying Jackson's grievances regarding the Etomidate Protocol, the FDOC simply stated "[t]he policy/procedure regarding lethal injection does not violate the constitutional standards of state or federal levels." Jackson SAC Ex. B. And when it denied Brant and Anderson's grievances regarding the Etomidate Protocol, it again explained that the FDOC's lethal injection procedure "does not violate state or federal constitutional standards." Brant FAC Ex. B; Anderson SAC Ex. B. Although Defendants argue that they had to issue general responses to Plaintiffs' grievances regarding etomidate because Plaintiffs' grievances were so conclusory, such argument is unavailing. <u>See</u> Motions ¶¶ 21-22. In their informal grievances regarding the Etomidate Protocol, Plaintiffs detailed, for example, the alleged short anesthetic effects of etomidate and their concern that the FDOC's use of etomidate is not a meaningful improvement from its prior procedure. Amended Complaints Ex. B. Yet, the FDOC's responses to

Plaintiffs' grievances regarding the Etomidate Protocol do not even acknowledge that the FDOC changed its drug combination or the differences between etomidate and midazolam. See id.

Further, the issuance of seemingly identical, boilerplate responses to grievances challenging three different lethal injection protocols (Pentobarbital II Protocol, Midazolam Protocol, and Etomidate Protocol) indicates that the FDOC has a general practice of denying these types of requests for administrative relief, and that regardless of the amount of detail a prisoner puts in his grievances regarding a protocol (which the FDOC solely controls), the FDOC would respond in the same manner.[24] In fact, once Plaintiffs received the FDOC's denials of their informal grievances regarding the Etomidate Protocol and saw that it was identical to the denials of their prior informal grievance regarding the Midazolam Protocol, Plaintiffs likely knew that their formal grievance and appeal would also have identical outcomes. Nonetheless, despite knowledge of the FDOC's inevitable rejection, Plaintiffs completed the three-step grievance process regarding the Etomidate Protocol to satisfy the PLRA exhaustion requirement.

The PLRA exhaustion requirement is designed to alert prison officials to perceived problems and to enable them to take corrective action before federal litigation is commenced. See Woodford, 548 U.S. at 93. The Court is of the opinion that Plaintiffs' labors of completing the three-step grievance process before filing their Amended Complaints gave prison officials the precise opportunity to take the corrective action for

---

[24] While the Court may not be able to rely on record evidence submitted in Jackson's first § 1983 actions, the Court finds it relevant that the FDOC issued a similar response to Jackson's grievance challenging the Sodium Pentothal Protocol. See Jackson I (Doc. 13-1).

which the PLRA contemplates. However, the FDOC's responses show that it does not intend to consider any challenge to its lethal injection protocol based on Plaintiffs' grievances. Further, the boilerplate denials of Plaintiffs' grievances and appeal are not helpful to the Court's resolution of Plaintiffs' allegations.

In sum, while the FDOC may have "apparent authority" to grant administrative relief, Defendants have not overcome Plaintiffs' claim that the FDOC "declines to ever exercise" such authority. See Ross, 136 S. Ct. at 1859. The "facts on the ground" demonstrate that the FDOC does not intend to change its lethal injection protocol based on a prisoner's administrative grievance, and thus, the grievance process is not "'capable of use' for its pertinent purpose." See id. (quoting Booth, 532 U.S. at 736). When the Supreme Court held that an administrative remedy may be "unavailable" if the grievance process "operates as a simple dead end," it surely contemplated the type of non-isolated, systemic dead end that Plaintiffs faced here. Accordingly, resolving the disputed issues of fact, the Court finds that Plaintiffs could not have done anything more to exhaust available administrative processes, and thereby, they were relieved of the obligation of completing the exhaustion procedure regarding the Etomidate Protocol prior to initiating these actions. Consequently, Defendants have not met their burden, and their request to dismiss these actions based upon Plaintiffs' alleged failure to exhaust their administrative remedies is due to be denied.

### B. Statute of Limitations

Defendants argue that Anderson and Jackson's claims are barred by the statute of limitations. Anderson Motion ¶¶ 25-26; Jackson Motion ¶¶ 25-26. In support of that argument, Defendants assert that because Jackson and Anderson admit that etomidate

"displays a pharmacodynamic profile" similar to 'thiopental,'"[25] the substitution of etomidate as the first drug in the protocol does not constitute a "major change" to the original lethal injection protocol implemented in 2000. Jackson Motion ¶ 25; Anderson Motion ¶ 25. As such, according to Defendants, Jackson's statute of limitations began to run on February 13, 2000 and expired on February 13, 2004, see Jackson Motion ¶ 26, and Anderson's statute of limitations began to run on March 22, 2004, and expired on March 22, 2008, see Anderson Motion ¶ 26.

In response, Jackson and Anderson assert that their Amended Complaints are not barred by the statute of limitations, because they contend that the FDOC's substitution of etomidate for midazolam constituted a substantial change to the lethal injection protocol. Jackson Response at 15-17; Anderson Response at 14-17. As such, according to Jackson and Anderson, their statute of limitations began to run on January 4, 2017, the date the FDOC adopted the current protocol. Jackson Response at 16; Anderson Response at 16. They further argue that determining "whether the substitution of etomidate is a significant change is a factual one[,] and thus[,] inappropriate for resolution at the pleading stage where the Court must accept [Plaintiffs'] allegations as true." Jackson Response at 16; Anderson Response at 16-17.

Jackson and Anderson's § 1983 claims are subject to Florida's four-year personal injury statute of limitations. See Henyard v. Sec'y Dep't of Corr., 543 F.3d 644, 647 (11th Cir. 2008). As noted above, it is well-settled that "a method of execution claim accrues on the later of the date on which state review is complete, or the date on which the capital

_____

[25] Thiopental sodium is another chemical name for sodium pentothal (the brand name for the drug used in Florida's first lethal injection protocol). See Lightbourne, 969 So. 2d at 353 n.19.

litigant becomes subject to a new or substantially changed execution protocol." McNair, 515 F.3d at 1174. Because Jackson's sentence of death became final on January 23, 1989, prior to Florida's adoption of lethal injection as a method of execution, Jackson was required to bring a lethal injection challenge by February 13, 2004, which is four years after the FDOC implemented lethal injection as its primary method of execution. See Henyard, 543 F.3d at 647. Likewise, because Anderson's sentence of death became final on March 22, 2004, Anderson was required to bring his lethal injection challenge by March 22, 2008. As such, in order to overcome Defendants' statute of limitations defense, Jackson and Anderson "must show that [they] filed [their] § 1983 complaint within [four] years of a significant change in [Florida's] method of administering lethal injections." Arthur v. Thomas, 674 F.3d 1257, 1259 (11th Cir. 2012).

The Eleventh Circuit has held that "[w]hether a significant change has occurred in a state's method of execution is a fact-dependent inquiry . . . ." Id. at 1260. Indeed, if a court determines there has not been a "significant change," such conclusion should be "premised on the specific factual allegations and/or evidence presented and considered" in the case. Id. Nevertheless, if the allegations and evidence presented in the case are "materially the same" as those presented and considered in a previous case, the Court may rely on the previous case to find an action is untimely. See Mann v. Palmer, 713 F.3d 1306, 1313-14 (11th Cir. 2013); see also Gissendaner v. Comm. Ga. Dep't. of Corr., 779 F.3d 1275, 1284 n.8 (11th Cir. 2015) (finding "a court may dismiss a complaint as untimely – without an evidentiary hearing or discovery – if the allegations and evidence presented are 'materially the same' as those presented in a previous case in which the denial of relief was affirmed"); Valle, 655 F.3d at 1233; DeYoung v. Owens, 646 F.3d 1319, 1325

(11th Cir. 2011).

In their Amended Complaints, Jackson and Anderson argue that Florida's substitution of etomidate amounts to a "substantial change" because "[u]nlike midazolam, etomidate causes significant pain upon injection. It is ultra-short acting and is likely to wear off before the execution is complete." Jackson SAC ¶ 69; Anderson SAC ¶ 69. They further allege that etomidate "acts on the brain in a completely different manner than midazolam"; and the "switch implicates numerous issues that did not exist until the adoption of the etomidate protocol." Jackson Response at 17; Anderson Response at 17. Jackson and Anderson contend that they are entitled to an opportunity to prove that this is a substantial change through discovery and a full evidentiary hearing before the Court determines whether the statute of limitations bars the claims in their Amended Complaints. Jackson Response at 17; Anderson Response at 17.

Defendants do not dispute that no other court, federal or state, has decided whether the substitution of etomidate for midazolam (or sodium thiopental as Defendants argue) is a "significant change" in Florida's lethal injection protocol for purposes of determining when the statute of limitations accrued.  As such, the Court finds that Anderson and Jackson's allegations regarding etomidate are not so similar to those presented and fully litigated in prior cases such that their Amended Complaints are subject to dismissal under Rule 12(b)(6). See Arthur, 674 F.3d at 1260 (noting that just because no court has found a significant change based on the evidence previously presented does not mean that such evidence does not exist). The Court must allow Jackson and Anderson an opportunity to engage in discovery, and it must consider Anderson and Jackson's factual allegations before concluding whether the claims in their

Amended Complaints are untimely. See id. at 1262 (reversing dismissal under Rule 12(b)(6)). Accordingly, Defendants' statute of limitations argument does not warrant dismissal at this stage of the proceedings.

### C. Failure to State an Eighth Amendment Claim Upon Which Relief May be Granted

Defendants also allege that Plaintiffs' Amended Complaints should be dismissed because they fail to state any Eighth Amendment claim for which relief can be granted. See Anderson Motion ¶¶ 27-63; Jackson Motion ¶¶ 27-63; Brant Motion ¶¶ 26-62. To state an Eighth Amendment method-of-execution claim, a plaintiff must plead facts sufficient to satisfy the two-prong test established in Glossip, 135 S. Ct. at 2737, and Baze v. Rees, 553 U.S. 35 (2008). First, the plaintiff must allege that "the method challenged presents a risk that is 'sure or very likely to cause serious illness and needless suffering,' and gives rise to 'sufficiently imminent dangers.'" See Price v. Comm'r, Dep't of Corr., 920 F.3d 1317, 1325-26 (11th Cir. 2019) (quoting Glossip, 135 S. Ct. at 2737; Baze, 553 U.S. at 50)). A "substantial risk of serious harm" does not mean any possibility that the prisoner will suffer pain; rather, the conditions must establish the sort of "objectively intolerable risk of harm that qualifies as cruel and unusual punishment prohibited by the Eighth Amendment." Id. (quotations omitted). Indeed, "the inmate must show a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" Id. Second, the plaintiff must identify "a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." Id. (quoting Bucklew v. Precythe, 139 S. Ct. 1112, 1125 (2019)). "[T]he state must be able to

implement and carry out that [alternative] method of execution relatively easily and reasonably quickly, and in a manner that 'in fact significantly reduces a substantial risk of pain' relative to the intended method of execution." Boyd v. Warden, Holman Corr. Facility, 856 F.3d 853, 866 (11th Cir. 2017) (quoting Glossip, 135 S. Ct. at 3737). Further, in Bucklew, the United States Supreme Court clarified that "[a]n inmate seeking to identify an alternative method of execution is not limited to choosing among those presently authorized by a particular State's law." 139 S. Ct. at 1128. Thus, a plaintiff can identify a "well-established protocol in another State as a potentially viable option." Id. Nevertheless, at the pleading stage, a plaintiff does not need to prove his Eighth Amendment claim, "he only need[s] to allege sufficient facts to make that claim plausible on its face under Glossip." Lee v. Comm'r, Ala. DOC, 731 F. App'x 885, 888 (11th Cir. 2018).

Defendants argue that the Amended Complaints fail to plead sufficient facts that would entitle any of the Plaintiffs to relief under the Eighth Amendment. See Anderson Motion ¶¶ 27-63; Jackson Motion ¶¶ 27-63; Brant Motion ¶¶ 26-62. They assert that Plaintiffs' allegations are speculative and that they fail to recognize the Florida Supreme Court's factual findings regarding the constitutionality of the current lethal injection protocol in Asay v. State, 224 So. 3d 695 (Fla. 2017). See Anderson Motion ¶¶ 29-34; Jackson Motion ¶¶ 29-34; Brant Motion ¶¶ 28-33. They also contend that the Florida Supreme Court in Jimenez v. State, 265 So. 3d 462, 474-45 (Fla. 2018), already addressed and summarily rejected Plaintiffs' challenges to etomidate's efficacy following Eric Branch's execution. See Anderson Motion ¶¶ 39-41; Jackson Motion ¶¶ 39-41; Brant Motion ¶¶ 38-40. Further, Defendants argue that Plaintiffs "fail[] to allege any facts

showing that pentobarbital could be feasibly obtained and readily implemented in Florida's lethal injection protocol." Anderson Motion ¶ 57; Jackson Motion ¶ 57; Brant Motion ¶ 56.

At this time, the Court declines to find that Plaintiffs' claims are foreclosed by the factual findings and legal conclusions made by the Florida Supreme Court in <u>Asay</u> and <u>Jimenez</u>. <u>See</u> <u>Lee</u>, 731 F. App'x at 888 (holding plaintiff is "entitled to an opportunity to prove – as he alleged in his complaint . . . that the use of midazolam will result in a serious risk of serious harm, and that pentobarbital is available to Alabama, regardless of the factual findings and legal conclusions reached by other courts in separate cases."). Indeed, Plaintiffs were not privy to either of those cases, they have not consented to be bound by the findings of <u>Asay</u> and/or <u>Jimenez</u>, and they had no control over the claims raised in either of those cases. <u>See</u> <u>Grayson v. Warden, Comm'r, Ala. DOC</u>, 869 F.3d 1204, 1223-24 (11th Cir. 2017) (finding district court erroneously relied on issue preclusion and improperly imported factual findings from a separate lethal injection case). Further, Defendants ignore the fact that Plaintiffs' in these actions rely on additional experts and evidence to support their challenges to the Etomidate Protocol. Notably, Asay only presented the testimony of Dr. Mark Heath in support of his Eighth Amendment challenge. <u>See</u> <u>Asay</u>, 224 So. 3d at 701. Here, Plaintiffs offer the declarations of Dr. Lubarsky and Dr. Sneyd for their proposition that etomidate is an insufficient first drug to the three-drug protocol. <u>See</u> Amended Complaints Exs. C, G.

For his part, Jimenez argued that the events during Eric Branch's execution constituted new evidence requiring reconsideration of the constitutionality of the Etomidate Protocol and offered Dr. Lubarsky's declaration as support; however, the

Florida Supreme Court affirmed the trial court's summary denial of that claim as conclusory and found "it [was] impossible to know whether Branch's actions were in protest of his execution or a reaction to etomidate." Jimenez, 265 So. 3d at 475, 492.[26] In their Responses, Plaintiffs note that the "factual context has changed since the Jimenez decision." Jackson Response at 22; Anderson Response at 22; Brant Response at 19. For example, Plaintiffs maintain that they are now in receipt of autopsy reports that show "three of the four individuals executed using etomidate developed acute pulmonary edema during their executions." Jackson Response at 19; Anderson Response at 19; Brant Response at 15. Plaintiffs provide copies of these autopsy reports, see Responses Ex. B, and offer the expert declaration of Dr. Mark Edgar, which provides, inter alia, that Branch's autopsy report indicates that Branch likely developed acute pulmonary edema during the administration of etomidate, see id. Ex. A at 4. Further, the evidence from Dr. Sneyd has never been presented to any court and the evidence from Dr. Lubarsky has not been addressed on the merits. Thus, the factual findings in Asay would not appear to foreclose the challenges presented by these Plaintiffs presenting their new evidence. Indeed, similar to the question of whether there was sufficient evidence to determine whether a new lethal injection protocol constituted a "significant change," the fact that the evidence presented in Asay did not support a viable Eighth Amendment claim under Glossip does not mean such evidence could never exist. See Arthur, 674 F.3d at 1260.

Viewing the facts in the light most favorable to Plaintiffs, as the Court must, the

---

[26] The Court observes that the Honorable Barbara Pariente wrote a dissent to the majority's opinion in Jimenez, finding that Dr. Lubarsky's declaration regarding Eric Branch's execution amounted to new information that was unknown at the time of Asay's challenge to the Etomidate Protocol, and thus, the case should have been remanded for an evidentiary hearing. Jimenez, 265 So. 3d at 492 (Pariente, J., dissenting).

Court finds that Plaintiffs have alleged facts sufficient to state a plausible Eighth Amendment method-of-execution claim. Plaintiffs' assertions that etomidate is insufficient to render them insensate for the duration of the execution presents a reasonable claim that Florida's lethal injection protocol creates a substantial risk of serious harm. See West v. Warden, Comm'r Ala. DOC, 869 F.3d 1289, 1298 (11th Cir. 2017) (citing Baze, 553 U.S. at 53) (noting "[i]t is uncontested that" failure to "render the prisoner unconscious" would create "a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and the pain from the injection of potassium chloride"). Plaintiffs also have supported this allegation with declarations containing pharmacological and practical information. See Amended Complaints Exs. C-H. The Court further finds that Plaintiffs have sufficiently pled the existence of a plausible alternative that would eliminate the alleged risk associated with Florida's current lethal injection procedure. Plaintiffs assert that a single dose of pentobarbital would entirely avoid the pain and short-acting anesthetic effects associated with etomidate and would remove the risk of suffocation and pain that the second and third drugs create. See Amended Complaints ¶¶ 74-81; see also West, 869 F.3d at 1298. Plaintiffs assert that pentobarbital is readily available, as other states have access to pentobarbital and use it for their single-drug procedures. See Amended Complaints ¶¶ 74-81; see also Lee, 731 F. App'x at 888. The Court is persuaded that Plaintiffs' allegations state a plausible Eighth Amendment method-of-execution claim. Thus, Defendants' Motions are due to be denied as to Plaintiffs' Eighth Amendment claims against them, and the parties will be given an opportunity to further develop the facts.

In light of the foregoing, it is hereby **ORDERED:**

1. As to <u>Jackson II</u>, 3:14-cv-1149-J-34JBT:

    a. Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. 65) is **DENIED**.

    b. **On or before October 28, 2019**, Defendants must answer the Second Amended Complaint.

    c. **On or before November 15, 2019**, the parties must complete their case management obligations under Local Rule 3.05 and file a case management report. <u>See</u> Doc. 17.

2. As to <u>Anderson II</u>, 3:14-cv-1148-J-34JBT:

    a. Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. 60) is **DENIED**.

    b. **On or before October 28, 2019**, Defendants must answer the Second Amended Complaint.

    c. **On or before November 15, 2019**, the parties must complete their case management obligations under Local Rule 3.05 and file a case management report. <u>See</u> Doc. 14.

3. As to <u>Brant</u>, 3:13-cv-412-J-34MCR:

    a. Defendants' Motion to Dismiss Plaintiff's Amended Complaint (Doc. 104) is **DENIED**.

    b. **On or before October 28, 2019**, Defendants must answer the Amended Complaint.

    c. The Clerk of the Court is directed to redesignate this action as a Track 2

case pursuant to Local Rule 3.05.

d. **On or before November 15, 2019**, the parties must complete their case management obligations under Local Rule 3.05 and file a case management report.

**DONE AND ORDERED** at Jacksonville, Florida, this 23rd day of September, 2019.

MARCIA MORALES HOWARD
United States District Judge

Jax-7
C: counsel of record